Good morning, Your Honors. May it please the Court, my name is Judy Wood and I'm representing El Said. There are three issues in this case. The first issue is whether his suffering in Egypt amounted to harassment or persecution. The next issue is whether that persecution was on account of one of the protected grounds. The next issue is whether the Convention Against Torture serves him. This is actually a very unusual case and one of the issues that troubles me and that I'd like you to start with. Your Honor, may I interrupt you for a moment? I'm slightly hard of hearing and I can't really hear you. I apologize. Is that better? Yes. I would like to ask you to start with the final issue first and that is the cat claim. What struck me as unusual about this case is that the person whom your client fears actually has tortured people before. That's the start of the whole series of events. How do we determine what is the likelihood of torture? I mean, where do you move from some likelihood to enough likelihood? That's always troubled me as to how we quantify that. Well, Your Honor, in response to that question, not only have we submitted numerous reports about torture in Egypt at the time that this case was going on, but the incidence of torture has continued. That material is not in the record and can't be looked at by us because it's factual material without a motion to reopen. The factual material really is not available to us. But my question is a little more focused than that anyway because it's not really a general fear of torture as I understand it. He's afraid of the same guy who was involved in the previous incident who set the person on fire. Well, my client testified, Your Honor, in court actually on pages 235 and 236, and his father testified, and he testified on pages 198 and 199 of the CAR that that person who tortured the individual in jail was released, and he's afraid of that person going after him. Exactly. That's exactly what I'd like you to address is how do we quantify how likely it would be that your client would face torture at the hands of this person? How do we know what percentage to give to that? Well, it's a cumulative effect, and it's in conjunction with the fact that false arrest warrants have been issued against my client, and they were given to the father, and the father testified, and he was found totally credible that he saw these arrest warrants, and it's perfectly plausible and likely that once someone is put in jail, especially as a political dissident in Egypt, once someone is incarcerated, it is more likely, far more likely than not, that they will in fact be tortured by the Egyptian authorities. Is it relevant that your client lived in Egypt for a period of time, I think about a year after the trial, and did not suffer any sort of retribution? I think that the incidence of torture is endemic throughout Egypt and has gotten worse. I know that he left the town where he was doing a trial, and then he went to Cairo for a while, but he was in hiding in Cairo, and then after he left, they didn't give up. They went to visit the father, they harassed the father. Allegedly they set fire to the father's place of work, and they brought these warrants to the father. The father was able to obtain information regarding warrants against his son, and the father said, and was found totally credible, and the father is a government official, that he fears what will happen. He said, on the record, that if his son is sent back to Egypt, he'll be arrested at the airport, incarcerated and tortured. And that's what they're terrified of. Let me ask you specifically with regard to Judge Thunheim's question on timing. When was Omar released from jail or prison? In other words, was the one year when your client stayed in Egypt a time when Omar was in prison, or was he out and about? He was out and about. During that whole time? He was only on to house arrest for one month. So I think it's clear that this person, El-Sayed, is definitely eligible for relief under the Convention Against Torture. In fact, the judge himself reiterated that point over and over again during the course of the hearing, and even in his decision. He said, I think that torture might happen. Well, you don't have to prove with an absolute certainty that torture will happen. It's more likely than not, in the context of Egypt and in the context of this criminal trial, that Mr. El-Sayed will be tortured. But going back... You mentioned that Mr. Sayed's partner, Mr. Kotter, I believe it is, also faced threats. Where is he now? Mr. Kotter is still in Egypt, to my knowledge. Practicing law? I don't know. I don't know his whereabouts. As to asylum, I think that Mr. El-Sayed is not only eligible for relief under CAT, but eligible for asylum. The reason being is he is a member of a social group. He's a whistleblower. In this court, you decided that Henriquez, a woman who was a whistleblower, found to be a whistleblower because she gave testimony in open court against the people who murdered her father. She was found to be a member of a social group, whistleblowers. Well, El-Sayed wasn't just doing a wrongful death action. He actually wrote a letter to the prosecutors, which initiated the criminal case against the perpetrator of the torture of the person who was actually killed in prison and whom he is afraid of. So he's definitely visible. There's particularity. Am I remembering this right, that the government argues that you, or your client rather, did not exhaust the particular social group ground before the BIA, and instead, I thought the analysis was just predicated on political opinion. Am I right on that? Well, I think we did exhaust it. I mean, I think he had a definite political opinion. He said over and over again during the course of his hearing that he's against the endemic corruption, endemic corruption in Egypt. Well, okay, but that's different from the particular social group ground, as I understand it. And I thought to show a nexus with respect to political opinion, we'd have to conclude under our cases that this wasn't just a personal thing between your client and the, right? That's correct, Your Honor. And I think that the government actually misstated. During the course of the hearing, the father used the word vendetta. He was describing what happened to his son, and he mentioned the words vendetta. And so the government seized on that word and caused it to be amplified, and then the judge followed their lead. But actually, it wasn't only a vendetta. It may have been partly a vendetta. In many cases, you can have mixed motives. Oh, yeah, I know. But in the other cases we have where we've said that a whistleblower, you know, was sort of expressing a political opinion, we've said that it's got to be an attack, you know, kind of on an institution of government or some kind of systemic corruption, right? That is correct, Your Honor. And El-Sayed isn't just, wasn't just, and he said on the record, he wasn't just against this person, the one person who doused the victim, the original victim with gasoline and who died as a result of that. But he was against widespread corruption in Egypt, and he said it during the course of his hearing. So what else did you, I don't remember from the record, what else did your client say that he had done or been involved in, in terms of, you know, I guess, what, bringing other suitors in? What other activities do we have besides his participation in this one legal action? Well, in particular, as far as he was concerned, he mentioned in his case, he testified that he says, quote, I came here because I felt that he, meaning the officer, might be able to detain me or press false charges against me with anything, any crime. And so he was definitely afraid of that happening, because, and he went on to describe how that happens all the time in Egypt, that there was an emergency rule at the time, and now there are other rules, where the government doesn't really need much reason to detain someone. They just detain whomever they want to. Once they detain them, they're tortured. So it's this system of mass corruption. I know, but I'm... I mean, I don't know what his activities were, right? I know he was involved in this one lawsuit against this one individual. And I guess I read our cases as saying, it can't just be that. It's got to be your activities were aimed at some broader systemic corruption, or at least, you know, you're perceived as going against an institution of government. And I guess I'm still not hearing from you, what else was your client doing that would fit within that line of our case? The case is more than meets the eye, because he wrote a letter to the prosecutor, basically accusing the officials of torturing someone. So he brought that to light, and then there was a wide outcry, a public outcry, against what was going on in the prisons. And El Sayed was in the forefront of that, leading the fray, if you will. You have exceeded your time, but we'll give you some rebuttal time after the... Thank you. Good morning. May it please the Court, Jane Shoffner for the respondent. Mr. El Sayed has simply failed to identify any record evidence that would compel reversal of the agency's conclusion that he failed to establish a legal basis for his actions. I'd like to address your attention also, direct your attention also to the CAT claim. There are a couple of things that are unusual in this case. One is that the BIA said that Mr. El Sayed did establish a likelihood of torture, it just wasn't more than 50%. So that's a rare finding, or at least that's a rare finding. In my experience, an unusual thing for the board to say. And I'm struggling to figure out how anybody quantifies more likely than not. And the other thing that strikes me as unusual is that oftentimes the allegations of torture are just sort of generic. A lot of people get beat up in prison and so on and so forth. And here there is a single individual whom the petitioner fears, and that individual we know for a certainty has actually tortured someone else by dousing him with kerosene and killing him. So how do we decide, how does the BIA decide, and how do we decide whether that kind of evidence compels a conclusion that it's more than 50%? Or less than 50%? How do we know that? Certainly, and I certainly can appreciate your concerns. The more likely than not scenario, by the way, is not limited only to CAT claims. The agency also applies it in the withholding. No, but that's the one that I'm, personally that's the one that I'm concerned about in my own thinking. Right. Because of the torture that occurred in this case. Of course, of course. I can't speak to how the individual immigration judge in this case determined that there was a likelihood, but it was not more likely than not. But I can tell you there are a lot of things that we don't know. That we don't know, for example, when those arrest warrants were issued. We know that the father obtained them in 2004, more than five years before the individual merits hearing, but we don't know when those arrest warrants were issued. We also don't know who caused those arrest warrants to be issued. Mr. El-Sayed claims to be afraid that this detective is going to be charged with a crime. He is out to seek retribution, but he also claims, and this is on 214 of the record, that his wife's family, also a well-connected family, his wife's family threatened to put him in prison. They were upset because he left the country. They thought that he was a traitor to Egypt. Her uncle was a minister in the Justice Department, and he received threats from them that they also wanted to send him to prison. We don't know whether those arrest warrants are still in effect. Again, the father obtained them in 2004. The individual merits hearing was in 2009. It's now 2015. The detective, who Mr. El-Sayed participated in a case, is now in prison. He was only in custody for one month. He was released. Mr. El-Sayed was living in Egypt without difficulty during a more than one year period after the trial concluded. I thought he said that he was in hiding. He was in Egypt. It's not clear what he was doing when he was in Egypt. You said without difficulty, and that strikes me as not consistent with what we have before us. He says that he was not harmed in any way. We don't know what that means. That is correct. He had moved to another location. We don't know whether he was going out and about getting groceries. He changed locations and he found a place where he had no harm. The inquiries about his whereabouts only started after he left the country. Again, that's consistent with his claim that his wife, who was divorcing him because he left the country, that her family was out to get him. The immigration judge found Mr. El-Sayed and his father both to be credible witnesses, correct? That's correct. And both testified with regard to death threats, death threats that Mr. El-Sayed had made in the courtroom directed toward him, and then the testimony about the motorcycle driver that tried to run him down. Why isn't that credible evidence of past persecution, actual death threats, why isn't that enough? This court's cases have held that death threats, while uniformly unpleasant, are often hollow, that an individual may not carry out those threats. This was a person who made the death threat who had actually carried it out against another person right before that time. The detective was accused and found guilty of two crimes. One of them was the death threat of having tortured a prisoner, but he didn't do anything at all to Mr. El-Sayed after he was released from prison. We don't know what happened to Mr. Kattar, Mr. El-Sayed's partner, during the hearing, and this is, I believe, at page 218 of the record. He said he simply didn't know, he'd maintained contact with Mr. El-Kattar for a period of time after he came to the United States. But then lost touch with him, so Mr. El-Kattar even continued to live without difficulty in Egypt after this trial was concluded. Is it true that we don't know at this point whether these two arrest warrants are still valid or not? That's true, we don't know whether they're still, were still valid, we don't know when they were issued. We don't know whether they were issued for any reason having to do, not that nexus is a requirement in a Katt claim, but we don't know why they were issued or by whom or who caused them to be issued. When you say that we don't know if they're still valid, I guess I'm wondering what's the basis for speculating on that? Is there some kind of an expiration date that Egyptian arrest warrants normally carry? We simply don't know, there's no evidence in the record, and again, it's Mr. El-Sayed's burden to show that it is more likely than not. Don't we have the warrant? We do have something along those lines, and so there's no, and everything was found credible, so what we have in the record is an arrest warrant for him that on its face has not expired, so why are you saying we don't know if it's still valid? Well, we do know that he claims to be afraid of the government and that the board issued this decision actually in January of, I'm sorry, July of 2011, we know that Arab Spring occurred in the interim, there was no motion to reopen regarding, so the government he claims to be afraid of is actually no longer in power. We don't know what the effect of this is. Well, just as the other side can't rely on new things happening, neither can you. We have the record that we have, and as I said earlier, what strikes me as unusual about it is it isn't just a generic, the whole government is this way or that way, there's a fear of a specific government official who has engaged in torture in the past who's after him. Well, acquiescence is also a key part of Mr. Al-Sayed's burden in proving it is more likely than not that he will be tortured, and we know that this individual has previously been brought to justice. We know that the government has made efforts with other police actors. How is that relevant to a cat claim? If this guy finds him and, you know, tortures him and kills him, what good does it do him? He has to prove that it is more likely than not that he will be tortured by or with the acquiescence of the government. And this guy is a government official. And he's previously been prosecuted for torture, the government investigates and prosecutes other allegations of torture. There's evidence at pages 266 to 71 of the record, 746, 708 to 24, 963. The government, certainly torture occurs in Egypt, but he has to prove that he has an individualized risk, that he will be tortured more likely than not with the acquiescence of the government, and he simply has failed to meet that burden and he has not anywhere in his opening brief before this court identified any record evidence that would compel a contrary conclusion and no record sites. What else do you think he could have put on to get him over the 50% line? He could have produced evidence that the government at the time of the 2009 hearing was still looking for him. Except that wasn't the ground of the BIA's decision. The BIA's decision, as I understand it, was he has shown some likelihood of torture by or with the acquiescence of the government, it just isn't enough of a chance, it's less than 50%. Maybe I'm reading it wrong, but that's how I understood the board's decision. So I think, as I understood Judge Watford's question, it isn't his, it's mine, but what else could he have shown to bring him from 39% to 51% likelihood of being tortured? He, the likelihood I think depends on so many things we don't know the answers to. He could have produced more evidence regarding the effect of an arrest warrant that his father obtained in 2009 or 2004, five years before the hearing. Could have produced background information about whether there is an expiration date. Could have produced something from the friend of the father who reportedly provided these arrest warrants. Some information about why these arrest warrants were issued, who issued them, what the effect is. Could have produced evidence that Mr. or the detective still had some continuing interest in him. He was convicted in 2002, the individual merits hearing was in 2009. Mr. El-Sayed lived in Egypt for a year before coming to the United States, had no difficulties. There's no evidence that this detective is still interested in him. There's speculation, but there's also evidence that Mr. El-Sayed's wife's family is interested in him, that they want to send him to prison where he might face a likelihood of torture. There just simply isn't enough and there's not any record sites in the opening brief that would compel a contrary conclusion. I see I've exceeded my time. Two minutes for rebuttal. On page 928 of the record, there's a letter submitted and the father is writing a letter, which is part of the record. And he's describing what happens when the men who bring the, when the men are looking for his son. And he says that they, he added, they told him that they, it's on the 1, 2, 3, 4, third paragraph down, that they will arrest him. They will put him, we will detain him, and they were talking about another, they were threatening him that even if he got American citizenship, they were alluding to another case, they detained him, put him on trial, sentenced him. So he said, I know what happens in jail and detention, and we would like to see them back in the country to show you what we will do to them. And do you think America accepts asylum from Egyptians? Then in the record on page 854, it's important to note that Omar, the official, threatened El-Sayed in open court. And in the decision, the board's decision, page 8, they cite Cameltas. Now, and then they go on to the next paragraph, paragraph 10, and say some, there is some likelihood. Certainly respondent has provided sufficient evidence to demonstrate some likelihood. Well, Cameltas stands for the proposition that the judge and the board have to examine and discuss and consider all evidence, all evidence. So if you look at all the evidence about what is going on in Egypt then and now, there is a much more, much more, even more strong likelihood that even though this happened a long time ago, that he will be tortured if he's sent back. Thank you.
judges: Tunheim, Graber, Watford